[Civ. No. 7502. Second Appellate District, Division One.—June 5, 1933.]

GLADYS MAE TAYLOR, Respondent, v. AETNA LIFE INSURANCE COMPANY, Appellant.

[Civ. No. 7503. Second Appellate District, Division One.—June 5, 1933.]

GLADYS MAE TAYLOR, Respondent, v. GREAT WESTERN INSURANCE COMPANY, Appellant.

Gibson, Dunn & Crutcher and Philip C. Sterry for Appellants.

Harry L. Cohn and Cohn, Lambert & Jones for Respondent.

YORK, J.—These two actions were consolidated for trial by stipulation of the parties, and likewise have been consolidated for hearing upon appeal, and are now before this court upon a bill of exceptions.

These actions were brought by plaintiff as beneficiary under accident policies of insurance issued to her husband by the two defendant insurance companies. Plaintiff's husband lost his life as the result of gunshot wounds inflicted during an altercation which occurred after a collision between decedent's car and that of one Martinez. The policy issued by defendant Great Western Insurance Company insured plaintiff and her husband "against the effect of Personal Bodily Injury which is caused solely by accidental means". The policy issued by defendant Aetna Life Insurance Company provided for double indemnity if the death of the assured resulted "directly and independently of all other causes from bodily injuries effected solely through external, violent, and accidental means". The complaints against the defendant insurance companies alleged an accidental death. The Aetna Life Insurance Company interposed a defense that the death of plaintiff's husband was not the result directly and independently of all other causes from bodily injuries effected solely through violent or accidental means. However, it was stipulated that this defendant had, prior to the time of trial, and subsequent to the filing of its answer paid to the plaintiff the sum of $2,500, the face value of the insurance policy, and that if said defendant was liable at all, its liability would be only for the double indemnity provided for in said policy. The Great Western Insurance Company interposed the same defense, i. e., that the death was not the result of accidental means, and in addition thereto the defense that, if plaintiff should establish a right to recover, the amount of recovery should be limited to the proportionate amount of the named indemnity ($3,000) which that indemnity bore

to the total amount of like indemnity of that and other policies covering the same loss suffered by the beneficiary.

On the issues thus formed, trial was had before a jury resulting in judgments against the Great Western Insurance Company for the sum of $3,000 and against the Aetna Life Insurance Company for the sum of $2,500. The defendants appeal from these judgments.

The appellants maintain that the court made many errors in the course of the trial affecting the plaintiff's right of recovery, in giving certain instructions and in refusing to give requested instructions, and also in its rulings on the admission and rejection of evidence. Appellants also maintain that the court erred in receiving certain exhibits in evidence, and in refusing to declare a mistrial because of remarks of counsel for the plaintiff, and that counsel for plaintiff was guilty of misconduct which prevented the defendants from having a fair and impartial trial. In connection with the last-named point, appellants contend that plaintiff's counsel was guilty of flagrant misconduct in his opening statement, during the trial of the cause and in his closing argument to the jury, and to each statement so made appellants have taken an exception:

"Exception No. I. Mr. Cohn: I am going to prove it. You are setting up the defense that this man was justified in shooting and killing this fellow.

"Mr. Sterry: He was acquitted by the superior court.

"Mr. Cohn: He was acquitted by the machinery of several million dollars that wanted to avoid paying an insurance policy. I will show it, too.

"Exception No. II. (Mr. Cohn, continuing): We will show you this man was charged with murder and was found 'not guilty' telling this sort of a story—

"Mr. Sterry: Just a minute. I object to what he told.

"Mr. Cohn: It is set up in their pleadings, it is part of their defense, and the jury have a right to know, because we are going to anticipate it in our case in chief, the preposterous tale that he was being beat over the head with a wrench of a car or an automobile crank.

"Mr. Sterry: I assign those remarks as misconduct and ask the court to instruct the jury to disregard them.

"Exception No. III. Mr. Cohn, continuing: We will show you, ladies and gentlemen, as the case progresses, that

it was as cold and deliberate and horrible premeditated murder as you ever heard of. We will show you that although one jury was fooled by a bunch of lies that we are now in position to completely refute.

"Exception No. XII. Mr. Cohn: I might say—will you stipulate that this reporter's transcript, that is—I think Mr. Sterry will agree with me, that his whole transcript of the coroner's inquest is a conglomerate mass or mess. Practically two-thirds of it is incomprehensible, and, while I stipulated that the reporter if present would testify this is made from his notes, I am quite confident, if your Honor will read over this transcript, that is supposed to be a short-hand report of that inquest, you would come to the conclusion—couldn't help but come to the conclusion—that it must have been an inexperienced or an incompetent shorthand reporter taking it down or transcribing it, because half of the stuff don't make sense, not only with this witness, but with any of them. Mr. Sterry: I object to counsel's remarks. Mr. Cohn: You have found it to be true, haven't you? Mr. Sterry: No, I haven't, absolutely not. Mr. Cohn: Then I ask leave, since counsel won't be fair with me, to read it to the jury, the whole blame thing and see whether any human being could talk the way this stenographer says they talk. Mr. Sterry: I assign counsel's remarks as misconduct, and ask the jury to be instructed to disregard them. Mr. Cohn: You have been very fair with me up to this point; in fact, you have been very courteous. The Court: The jury will be instructed that all statements made by Mr. Cohn with reference to the condition of the transcript will be disregarded and the other statement of Mr. Cohn about opposing counsel will also be disregarded by the jury. Mr. Cohn: In that connection, I would like leave, then, for fear the jury may think I am unfair, to read the coroner's inquest. Will you permit me to read it and see if any human being could have given the testimony the way that stenographer said they did?

"Exception No. XIII. Q. (By Mr. Sterry): Referring again to your testimony at the coroner's inquest, page 7, will you read your answer starting on line 2, page 7, down to line 10? Mr. Cohn: Now, if that is to be read, your Honor, I insist that the witness be given the right to read

on page 12, lines 19 to 22, where he absolutely states to me that this is an error and was not the time he meant. Mr. Sterry: Just a minute. Mr. Cohn: All right, I will show it to the court. There is no use in misleading the jury. The jury is supposed to hear the truth here, not any trick.

"Exception No. XV. Q. Did he (Mr. Taylor) have a quick temper? Mr. Cohn: Objected to as argumentative. Mr. Sterry: I am trying to find out what the phrase 'quick tempered' means. Mr. Cohn: It means in this case if he loses his head if a Mexican crowded him off of the road.

"Exception No. XIX. Mr. Cohn: Now, may I ask Martinez to come up here and show us the scar of that wound. Come on up here. (Witness comes up before jury.) Now, Doctor, show us on the head where you found that. (Witness indicates.) Mr. Cohn: Where? A. Here is the scar. At this time I would say— The Court: Go over in front of the jury. Mr. Cohn: They have better eyes than I have if they can see it. Mr. Sterry: Just a minute. The Court: The jury will be instructed to disregard that. Mr. Cohn: Turn on the lights and let's see if they can find the scar here. The Court: The jury will be instructed to disregard the statement of Mr. Cohn that the jury would have to have better eyes than he has to see it.

"Exception No. XXI. Martinez being first duly sworn through the interpreter, called as a witness on behalf of the defendant, testified as follows: Q. By Mr. Cohn: Now, do you know what I am saying to you? Let the witness answer. Do you know now what I am saying to you? I insist, your Honor, in view of Croushorn's testimony and his own admissions that he is aping ignorance of the English language.

"Exception No. XXII. Mr. Cohn: I protest against the use of an interpreter with this fellow. It puts me at a disadvantage in cross-examination. We have a perfectly honest interpreter, and a good interpreter. I don't mean to cast reflection on her at all, but your Honor has had the experience, and Mr. Sterry has, and I am just handicapped when it comes to cross-examination. I think it is apparent to everyone in the courtroom. The Court: I don't think the showing is sufficient that this witness is familiar enough with the English language to be able to answer interrogations intelligently. Objection overruled. Mr. Cohn:

He didn't know a word I said, after 16 years in the United States. Mr. Sterry: I move that be stricken out. The Court: The remark is stricken and the jury instructed to disregard it.''

In the affidavit of the attorney for the appellants on motion for new trial, it is stated that during his closing argument to the jury, counsel for plaintiff argued to the jury that it was useless for anyone to pay premiums on any insurance policies, arguing in substance that all the insurance companies wanted was to collect premiums, but not to pay out money, and that he trembled to think of the future of his wife and children, because of the fact that he had worked hard for a great many years and had invested his savings in life insurance policies, but felt that such policies were no protection to his loved ones; all of which naturally would tend to prejudice the jury against the defendants.

While the evidence may be sufficient in law to support the jury's implied finding against appellants on the principal element of the controversy—that is, concerning the circumstances which led to the death of Mr. Taylor— nevertheless, the said evidence is not of that powerfully convincing character which would permit us to say that the persistent misconduct above shown did not result in a miscarriage of justice. For if the jury had not been thus prejudiced, there might have been a different finding upon the issues of fact which are of controlling force in the case.

The judgments are reversed.

Conrey, P. J., and Houser, J., concurred.